Matter of Samantha GG. v George HH. (2019 NY Slip Op 08468)





Matter of Samantha GG. v George HH.


2019 NY Slip Op 08468


Decided on November 21, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: November 21, 2019

527881

[*1]In the Matter of Samantha GG., Respondent,
v
George HH., Appellant. (And Another Related Proceeding.)

Calendar Date: October 8, 2019

Before: Garry, P.J., Egan Jr., Mulvey and Aarons, JJ.


Betty J. Potenza, Highland, for appellant.
Lindsay H. Kaplan, Kingston, for respondent.
Amy S. Ingram, Kingston, attorney for the children.



Egan Jr., J.
Appeal from an order of the Family Court of Ulster County (Mizel, J.), entered October 29, 2018, which, among other things, granted petitioner's application, in a proceeding pursuant to Family Ct Act article 6, for custody of the parties' children.
Petitioner (hereinafter the mother) and respondent (hereinafter the father) are the unwed parents of a son (born in 2005) and a daughter (born in 2010). The parties were in a relationship for approximately 12½ years but separated in July 2017 after the mother discovered that the father had been having an affair, prompting the father to move out of the parties' residence. The mother thereafter filed a petition seeking sole custody of the children, alleging, among other things, that the father's work schedule prevented him from providing adequate supervision for the children and that he was otherwise unresponsive to her attempts to establish a shared custodial arrangement. The father thereafter cross-petitioned for sole custody of the children.[FN1] Following a fact-finding hearing and a Lincoln hearing with each child, Family Court awarded the mother sole legal and physical custody of the children with scheduled visitation to the father. The father appeals, and we now affirm.
When rendering an initial custody determination, the paramount consideration for Family Court is determining the best interests of the children (see Eschbach v Eschbach, 56 NY2d 167, 171 [1982]; Matter of Patricia RR. v Daniel SS., 172 AD3d 1471, 1472 [2019]). "There are a number of relevant factors that must be considered prior to determining [the children's] best interests, including the quality of the parents' respective home environments, the need for stability in the child[ren's] li[ves], each parent's willingness to promote a positive relationship between the child[ren] and the other parent and each parent's past performance, relative fitness and ability to provide for the child[ren's] intellectual and emotional development and overall well-being" (Matter of Nicole TT. v David UU., 174 AD3d 1168, 1169 [2019] [internal quotation marks and citation omitted]; Matter of Lorimer v Lorimer, 167 AD3d 1263, 1264 [2018], appeal dismissed and lv denied 33 NY3d 1040 [2019]). In rendering such a decision, Family Court's fact-finding and credibility determinations are entitled to great deference and, as long as the ensuing custody determination is supported by a sound and substantial basis in the record, it will not be disturbed on appeal (see Matter of Amanda YY. v Ramon ZZ., 167 AD3d 1260, 1261 [2018]; Matter of Shirreece AA. v Matthew BB., 166 AD3d 1419, 1422 [2018]).
Initially, "[a]lthough an award of joint custody is an aspirational goal in every custody matter," contrary to the father's assertion, the record demonstrates that the parties are not able to effectively communicate with one another in order to provide for the children's needs and, therefore, a joint custodial arrangement is not presently in the children's best interests (Matter of DiMele v Hosie, 118 AD3d 1176, 1177 [2014] [internal quotation marks and citations omitted]; see Antonella GG. v Andrew GG., 169 AD3d 1188, 1189 [2019]; Hughes v Gallup-Hughes, 90 AD3d 1087, 1089 [2011]). Following the parties' separation, the children were initially reticent about visiting with the father and, although the mother encouraged continued visitation, the parties were unable to agree on a mutually acceptable custodial and visitation arrangement. Following the imposition of Family Court's temporary order of custody/visitation, both the mother and the father continued to have difficultly communicating with respect to custody and visitation issues, as the father often delayed responding or was nonresponsive to her text messages, or such text exchanges would devolve into arguments over noncustodial matters pertaining to, among other things, the father's child support obligation and other money matters.[FN2] Moreover, while the fact-finding hearing was pending, the mother and the father got into a verbal altercation during a custodial exchange at the paternal grandparents' house during which the father, in front of the daughter, his now-fiancÉe and numerous other family members, demanded that the mother leave the grandparents' residence, told her that she was not welcome and continued on a profanity laced tirade calling the mother, among other things, a "piece of a s**t" and questioned her motives as a mother. Given these admitted communication difficulties between the parties, we find that an award of joint custody was not feasible or appropriate.
Turning to the children's best interests, although both parents clearly love and care for the children, we find that there is a sound and substantial basis for Family Court's determination that it is in the best interests of the children for the mother to have sole legal and physical custody of the children, with scheduled visitation to the father. The evidence at the fact-finding hearing established that, throughout the parties' relationship, it was the mother who assumed sole responsibility for attending to the children's educational, medical and day-to-day needs. The father acknowledged that he has never taken an active role in taking the children to the doctor or dentist nor attended meetings at the children's respective schools, nor has ever spoken to the children's respective teachers.[FN3] Following the parties' separation, the mother arranged for the children to meet with a therapist in order to address any concerns that they may have with the abrupt and sudden change in the family dynamic caused by the separation. The father, however, showed little insight or concern into the effect that such a sudden and drastic change might have on the children and, tellingly, within a month of separating from the mother, moved in with his fiancÉe and her 12-year-old daughter and encouraged the children to start addressing his fiancÉe as "mom." Meanwhile, he adamantly opposed the children engaging in regularly scheduled therapy sessions, as he felt it was "a manipulation to the system" and that, absent "a drastic life or death situation," he would not be taking or engaging the children in therapy. He also evinced a lack of concern for the physical and mental well-being of his daughter after her sudden onset of acid reflux and stomach issues following the breakup of the parties' relationship, which appeared to be induced by the stress that she perceived at having to spend overnights at the father's new residence.[FN4]
The record reflects that, at this time, the mother is best able to provide a consistent and stable home environment and is the party more likely to facilitate and encourage a meaningful relationship between the child and the noncustodial parent (see Matter of Davis v Church, 162 AD3d 1160, 1161 [2018], lvs denied 32 NY3d 905, 906 [2018]; Matter of DiMele v Hosie, 118 AD3d at 1178). The mother is employed as a residential specialist for the ARC, with certain medical support responsibilities, and works a regular schedule from Monday through Friday from 8:00 a.m. to 3:00 p.m., except for Tuesdays when she works until 5:00 p.m. Since the parties' separation, the mother has continued to live in the three-bedroom apartment where the family had resided for the preceding five years. Each child has his or her own room at the mother's residence, which is conveniently located directly adjacent to the home of the children's paternal grandparents, providing both the mother and the father a degree of stability and flexibility with regard to child care, which they have each relied upon while balancing their work schedules with the children's respective school schedules. The father, meanwhile, recently changed jobs and is now employed on a per diem basis as a security officer at a hospital, often working overnight shifts, with a work schedule that changes on a weekly basis. He presently resides with his fiancÉe and her daughter in a two-bedroom apartment and, when his children stay with him, the daughter shares a bedroom with his fiancÉe's daughter and the son sleeps on the couch in the apartment's living room. Additionally, Family Court appropriately took into consideration the father's demonstrated animosity and lack of respect shown towards the mother, as well as the fact that he was argumentative and evasive when answering relevant questions during the fact-finding hearing, as such facts pertain directly to his parenting skills and his ability to foster a meaningful relationship between the children and the mother and reflect poorly upon his overall fitness as a parent (see Matter of Melissa WW. v Conley XX., 88 AD3d 1199, 1201 [2011], lv denied 18 NY3d 803 [2012]). Accordingly, upon reviewing the record as a whole and granting deference to Family Court's credibility determinations, we find that Family Court's determination granting the mother sole legal and physical custody with visitation to the father is supported by a sound and substantial basis in the record.
Garry, P.J., Mulvey and Aarons, JJ., concur.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: At the subsequent fact-finding hearing, the father clarified that he was, in fact, seeking joint custody of the children.

Footnote 2: At the fact-finding hearing, the father accused the mother of stealing money from their joint account and averred that she failed to follow through on a promise to pay him one half of the money that she received on her latest tax return. He also indicated his desire to have more custodial time with the children, as it would reduce the amount he had to pay in child support.

Footnote 3: When queried, the father did not know the name of either of his children's teachers nor who their pediatrician was. The father also indicated that he was unaware that, as a parent, he was able to access the children's educational and medical records and, in turn, had never inquired into same.

Footnote 4: The mother indicated that every time the daughter stayed at the father's residence over the weekend, the mother would get multiple texts or messages from the daughter indicating that she wanted to go back to the mother's residence.